Filed 11/19/13  In re E.M. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re E.M., a Person Coming Under the Juvenile Court Law. | B245227 (Los Angeles County Super. Ct. No. CK92399) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>H.M.,<br><br>        Defendant and Appellant. | |

    APPEAL from the orders of the Superior Court of Los Angeles County, Stephen Marpet, Juvenile Court Referee.  Affirmed.

    Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

    John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

H.M. (mother) appeals from the dependency court's orders declaring E.M. a dependent under Welfare and Institutions Code section 300, subdivisions (b) and (c),[1] and removing E.M. from mother's custody pursuant to section 361, subdivision (c). Mother contends substantial evidence does not support either the jurisdictional findings that E.M. was at substantial risk of harm and at substantial risk of suffering serious emotional damage, or the court's disposition order removing E.M. from mother. Mother also contends the dependency court violated due process by declining to appoint an expert witness on her behalf. We conclude substantial evidence supports the jurisdictional findings and dispositional orders, and the court did not abuse its discretion in denying mother's requests for an expert witness appointment. We affirm.

## STATEMENT OF FACTS AND PROCEDURE

Mother and R.M. (father)[2] are the divorced parents of E.M., a nine-year-old girl. Father has a history of schizophrenia but has been compliant with his medications and in good mental health for the past six years. Father filed for divorce in 2004. After initially reuniting, the couple permanently separated in 2006 and their divorce was finalized in 2008. Mother was granted sole custody of E.M., with monitored visitation rights for father. In March 2010, the family law court gave father joint legal custody and modified the visitation schedule to permit monitored visits on alternate weekends. Father lives in New Jersey.

In March 2007, Mother took E.M. to the hospital at UCLA, for treatment of headaches and sleeplessness caused by altitude sickness from visiting her father on Mt.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] The dependency court found R.M. to be the presumed father at the March 5, 2012 detention hearing.

Baldy.  The doctor prescribed medication for altitude sickness but also suggested the symptoms could be caused by stress and referred E.M. to counseling.

Mother took E.M. to the doctor after smelling gas in her apartment in April 2007. She took E.M. for follow-up examinations in November 2007 and February 2008. Doctors opined E.M. was recovering normally from possible carbon monoxide exposure. Mother asked about giving E.M. treatment in a "hyperbaric chamber," but the doctor reassured her such treatment was not necessary and carried certain risks.  The doctor cautioned mother not to discuss her medical concerns in front of E.M. because of the potential negative impact on E.M.

Mother took E.M. to an urgent care facility when she was experiencing "flu-like symptoms" in December 2009.  She discovered mold in her apartment a month later near the kitchen sink.  She moved out of the apartment in January 2010 and claims she and E.M. have been suffering from mold exposure ever since.  She has taken E.M. to multiple doctors, repeatedly faxing lists of medical tests that she wants the doctors to run on E.M. to explain symptoms such as frequent urination, dark and pungent diarrhea, black bruises appearing on hands only at night, and difficulty breathing.  Doctors observed that E.M. had a flat affect and would usually repeat verbatim the symptoms described by mother.

Dr. Mona Shah was E.M.'s treating physician for over a year.  In Dr. Shah's opinion, "Mother believes that she has the exact same thing as her daughter.  Mother is paranoid or obsessive compulsive.  She types out a manifest and a check list of lots of blood tests she wants done.  She has been offered therapy at the clinic but she has not accepted.  She believes she is dying f[rom] mold and something in her computer keyboard and that she has cancer.  We believe that mother needs a mental health evaluation.  The child is a[t] risk because of mother's delusions.  The child has no signs of mold exposure, she's a healthy child.  We can't keep poking and prodding this child because her mother believes she is sick."

Dr. Lidia Alonso saw E.M. several times and found nothing wrong.  She described mother as "obsessive" and "relentless" in insisting that E.M. was ill and seeking multiple

3

tests for E.M. Dr. Alonso and UCLA tried referring mother for mental health treatment, but she did not go.

Letters between Mother and the insurance company list numerous physical complaints and criticize the doctors' lack of a response. According to a children's social worker (CSW), "mother's writings alone are extremely concerning. The mother appears relentless in her pursuit of labeling her daughter as ill, which will then result in unnecessary medical tests and treatment, let alone emotional damage that stems from one being told repeatedly that they are not well and possibly very sick."

Dr. Paula Kuhlman wrote a letter to mother dated January 20, 2012, expressing concern that mother was suggesting symptoms to E.M. and subjecting her to unnecessary testing and doctor visits. Dr. Kuhlman notified the Department of Children and Family Services (Department) of her concerns for E.M.'s safety. The Department commenced an investigation.

On February 15, 2012, a CSW interviewed E.M. at school. She reported feeling fine at school but having nausea and frequent urination at home. A school staff member reported that when she walked E.M. back to class after E.M. spoke with the CSW, E.M. said "I always knew this day would come." Mother faxed a letter to the CSW several days later stating that E.M. "forgot to mention a few things" during the CSW's visit to the school. Mother said E.M. had "too many symptoms," which she forgot to include. Mother claimed E.M. had "Diarrhea, Stomach ache, Headache, Runny and Itchy Nose, Leaky gut feeling (her left side), Bruise on her hands, Pain in her heel, Frequent Urine and change in color of urine, Blurry Eyes, Coughing, Nausea, Vomiting (8 times), Itchy Skin, Skin Rash, Short Breath, Chest Pain."

On February 28, 2012, father reported to a CSW his feeling that mother overreacted to possible altitude sickness and carbon monoxide poisoning. He said "the sad part about all of this is that Mother really believes that she and [E.M.] are ill." He reported that when mother is under a lot of stress, she dreams of these types of illnesses and then researches them. He is concerned because mother said she is going to have

4

surgery to remove the mold from her body, and he feared that mother will find someone to do surgery on his daughter as well.

On February 29, 2012, the dependency court issued a warrant to remove E.M. from her home. E.M. was removed and placed in a foster home. At the March 5, 2012 detention hearing, the court ordered monitored visitation for mother twice a week and reasonable monitored visitation for father. Around April 30, 2012, the foster parents complained of harassing behavior by mother, and E.M.'s counsel requested that mother's monitored visits take place at the Department's offices only.

Three different attorneys filed motions to be relieved as mother's counsel between May 16 and July 18. Between May 16 and May 22, mother sought to, and did, represent herself without the assistance of counsel. The dependency court denied mother's, in propria persona, oral request for appointment of an expert on May 16, 2012.

The Department's May 22, 2012 report[3] states E.M. "is at very high risk of harm. Since the mother continues to believe her child is ill, it is likely the mother will continue to seek out unnecessary invasive medical examinations for her child as well as emotional damage that stems from one being told repeatedly that they are not well and possibly very sick." During the course of the dependency proceeding, mother sent numerous e-mails to the Department, father, and paternal grandparents describing E.M.'s purported illnesses and urging further medical treatment.

After repeatedly complaining to CSWs about the "poor quality of air" in the Department's offices, mother sent 12 e-mails between May 26 and July 10, 2012, detailing her own and her daughter's illnesses. A June 14, 2012 e-mail attaches a document referred to as "Exhibit 33" with an extensive list of symptoms and prescribed medications for both mother and E.M., ranging from Azithromycin for Sore and Itchy Throat to Itroconazole for Ovaryian Cysts and Diverticulitis. The e-mail stated: "As you know from my Exhibit 33, we have been taking a total of 24 prescribed medications to

---

[3] The dependency court entered several reports into evidence on the first day of the jurisdiction hearing on September 20, 2012.

5

treat our allergy and asthma symptoms for 2 years before your office took my child away from me." After complaining again about the air quality in the Department's offices, the e-mail threatens "Our further health damage from this point will become the whole responsibility of your office."

In August 2012, mother violated the dependency court's orders to not discuss health matters during visits with E.M several times, telling her daughter she smelled and needed to shower and brush her teeth more often. E.M. was increasingly uncomfortable during visits with mother and would go to the restroom to give herself a break from mother's presence. She no longer wanted to visit mother and preferred to live with father in New Jersey instead. The court ultimately suspended mother's visits with E.M. on September 4, 2012, pending the jurisdiction hearing.

In early September, the dependency court also granted the Department's request to appoint Dr. Steve Ambrose, a psychologist, as an expert to evaluate mother and father and make recommendations for E.M.'s placement and parent's visitation rights at disposition. The court order directed Dr. Ambrose to opine on the mother's ability to use services, her current psychological condition, and her ability to remain symptom free. Mother objected to the appointment and never returned Dr. Ambrose's calls to arrange an evaluation.

The jurisdiction hearing was five days long, taking place on September 20, 21, October 4, 23, and 24. The dependency court sustained three allegations under subdivision (b) of section 300 and one under subdivision (c).

At the October 30, 2012 disposition hearing, the dependency court ordered E.M. to remain removed from mother and placed with father in New Jersey.

# DISCUSSION

## A. <u>Substantial Evidence</u>

We examine the jurisdictional findings and dispositional orders under the substantial evidence standard of review. "[W]e look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations[.]" (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Issues of fact and the credibility of witnesses are questions for the trial court. (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) The pertinent inquiry is whether substantial evidence supports the findings, not whether contrary findings might have been made. *(In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

## B. <u>Jurisdictional Findings</u>

A court may exercise jurisdiction under section 300, subdivision (b), if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." In order to establish jurisdiction under subdivision (b) of section 300, there must be evidence of (1) neglectful conduct by the parent; (2) causation; and (3) serious physical harm or illness to the minor, or a substantial risk of such harm or illness. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

The dependency court found two allegations against mother true under subdivision (b) of section 300 and one against father. Mother only appeals the orders sustaining the

7

allegations against her. The sustained allegation against father alone would be sufficient to affirm. Where a court exercises section 300 jurisdiction based on multiple allegations, we may affirm "if the evidence supports the decision on *any one* of several grounds[.]" (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875, italics added.) Nonetheless, we examine both allegations against mother and conclude they are supported by substantial evidence.

The petition alleged mother "placed the child in a detrimental and endangering situation by repeatedly insisting that the child suffered from numerous physical ailments . . . ." The first sustained allegation stated mother took E.M. to the doctor repeatedly, demanding invasive medical tests, unnecessary medical treatment, and medicines for fictitious illnesses, thereby endangering her physical safety and placing her at risk of physical harm. The second sustained allegation stated mother has a five-year history of mental and emotional problems, including delusional behavior, and she has failed to obtain treatment for those problems, placing E.M at risk of harm and damage.

The dependency court heard testimony from numerous witnesses and considered voluminous documentary evidence at the jurisdiction hearing. The court recognized parents appropriately seek medical care and treatment when their children have problems, but "after reviewing the voluminous medical records and testimony, it's clear to me that at some point in this mother's life with this child, she went over the line; that the numbers of doctors and physicians and care and treatment and complaints that have occurred over the life of this child exceed any normality and have caused this child -- it's patently obvious to me that this child has suffered from the conduct of mother's continual, constant use of physicians."

Substantial evidence supports the dependency court's determination. Mother has requested at various points in time that E.M. receive a blood test for ovarian cancer, an ultrasound for a pelvic infection, antifungal medication, and a CAT scan, all of which doctors have found to be unnecessary. She also insists that E.M. must be examined by Dr. Roger M. Katz, a mold expert, and receive tests recommended by Dr. Ritchie C. Shoemaker, the author of a book entitled, Surviving Mold. Mother refuses to believe the

8

various doctors who have confirmed that E.M. is healthy and presents no symptoms of mold poisoning, fungal infection, or other medical problems.  She shows no signs of accepting responsibility for her actions and instead continues her relentless pursuit of labeling her daughter as ill and in need of medical testing and treatment.

Mother contends that because she never *demanded* E.M.'s doctors to conduct tests, but merely *suggested* the necessary tests to prove that E.M's illnesses were mold related, there cannot be substantial evidence that her conduct harmed E.M. or placed E.M. at substantial risk of harm.  The proper characterization of mother's communications with E.M.'s doctors is best left to the trial court.  "[I]ssues of fact and credibility are the province of the trial court.  [Citation.]"  (*In re Heather A. supra*, 52 Cal.App.4th at p. 193.)  The evidence before the dependency court supports a reasonable inference that mother was demanding action from the doctors.  E.M.'s doctor reported mother requested 30-40 tests and was sending 5 to 6 faxes *per day* to the clinic with a laundry list of medical complaints.

In contending her conduct was a reflection of a genuine concern about E.M.'s health and well-being, not abuse or neglect, mother asks this court to reweigh the evidence, which is not within our province.  Our role is to determine whether substantial evidence supports the findings.  The record contains ample evidence of mother's troubling behavior, and the dependency court could reasonably infer that mother's actions put E.M. at substantial risk of harm.

Section 300, subdivision (c) applies to a child who is suffering serious emotional damage or is at substantial risk of suffering serious emotional damage, despite positive aspects of the home environment.  (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1320 [child with a warm, close relationship with mother was still at risk of suffering serious emotional damage where mother's delusions about child's health render her unable to provide a stable and non-threatening home environment].)[4]

---

[4]  Section 300, subdivision (c) provides in pertinent part:  "The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage,

9

Mother acknowledges "disconcerting" facts about her behavior during supervised visitations but contends the problems stemming from visits after the initial detention do not support a finding under subdivision (c) of section 300. We reject Mother's argument. "'[T]he question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citation.]" (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1104 [child was at risk of suffering serious emotional harm from mother's actions both pre- and post-detention].)

The dependency court sustained allegations under section 300, subdivision (c), that mother "emotionally abused the child by repeatedly insisting that the child suffered from numerous physical ailments . . . ." The petition also alleges mother caused the child to mimic the fictitious symptoms and the child exhibited dissociated behavior to medical professionals.

Substantial evidence again supports the dependency court's order sustaining the allegations under subdivision (c) of section 300. The court drew specific attention to its conclusions about mother's emotional problems and their effect on E.M.: "This poor child was so nervous, she was washing her hands before the visits just to make sure she was going to be okay for mom. That's a problem. . . . [M]other is anxious and nervous and needs some mental health assessments and has not done so. She continues to refuse. And there's no question that -- in this court's mind, that this is an emotional problem that she needs to deal with. . . . [T]his is a child who is -- if not now suffering, there is a substantial risk of this child suffering from serious emotional damage, evidenced by the problems she was having. The flat affect that she displayed is clearly one of a psychological nature which causes, if not now, in the future, some severe problems."

Mother repeatedly expressed unfounded concerns about her daughter's health with little or no insight into how her statements were causing emotional harm to her daughter.

---

evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ."

Mother more recently brought medical books and discussed health concerns with E.M. during monitored visits in violation of court orders to refrain from doing so, repeatedly criticizing E.M.'s hygiene and warning her of the dangers of fungus.

The evidence considered by the dependency court included medical literature about Munchausen's Syndrome by Proxy or Factitious Disorder, and the opinion of an expert that mother's actions as reflected in court documents were consistent with such a diagnosis. Mother never saw a psychiatrist, but the court could reasonably infer her statements and actions are consistent with someone suffering from a psychological disorder. Because mother continues to refuse therapy, the risk to E.M. remains significant. The Department noted E.M's increasing discomfort during visits with her mom, which again supports a reasonable inference that mother's emotional problems were placing E.M. at risk of emotional harm. Mother's statements and behavior, and E.M.'s response, constitute solid, credible evidence that E.M. is at substantial risk of suffering "serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior." (§ 300, subd. (c).)

## Removal Order

Mother contends the order removing E.M. under section 361, subdivisions (c)(1) and (c)(3)[5] must be reversed. She argues substantial evidence does not support the

---

[5] Section 361 provides in pertinent part: "(c) A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . . [¶] . . . [¶] (3) The minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected

11

finding E.M. was at substantial risk of harm in mother's custody and the dependency court did not consider reasonable alternative means to protect E.M. We disagree.

Before a child can be removed from parental custody, the Department must prove, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home" and removal is the only reasonable means of protecting her physical health. (§ 361, subd. (c)(1).) "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child. [Citations.]'" (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.) We review a dispositional order removing a child from a custodial parent for substantial evidence. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

The ample evidence of mother's past and continuing efforts to obtain unnecessary medical testing and treatment for E.M. is sufficient to support the finding E.M. was at substantial risk of harm in mother's custody. (§ 361, subd. (c)(1).) E.M.'s statements and her actions during monitored visits with mother also support the finding E.M. would suffer severe emotional damage in mother's custody. (§ 361, subd. (c)(3).) The court-appointed expert opined that he had little reason to believe that mother could provide a safe and stable home environment for E.M., in light of mother's reported failure to attend therapy and her behavior with E.M. during monitored visits. Based on his interviews with E.M. and a social worker, mother "continues to display poor judgment, emotional volatility and a severe lack of insight" and E.M. "clearly does not feel safe and comfortable with [mother] even when their visits are monitored."

---

without removing the minor from the physical custody of his or her parent or guardian. [¶] . . . [¶] (d) The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based."

12

Mother contends the dependency court did not consider reasonable alternative means to protect E.M, arguing E.M. could have remained with mother under strict limitations preventing mother from taking E.M. to a health care practitioner or other medical professional without the court's approval, except in a medical emergency. Such an arrangement is not realistic in light of mother's prior actions violating court orders. (*In re John M.*, *supra*, 212 Cal.App.4th at p. 1127 [juvenile court reasonably decided not to place minor in mother's home with "strict supervision" where mother has already twice violated court orders].) Mother repeatedly refused or failed to follow court-ordered restrictions on her visits with E.M. She brought medical texts to the visits and asked E.M. questions about her health even after the court ordered her not to do so. Mother's inability to adhere to the court's restrictions ultimately led the court to suspend visitation until the jurisdictional hearing. Substantial evidence supports the court's finding that "there is no reasonable means to protect without removal."

## County-Funded Expert Witness

Mother contends the dependency court violated her right to due process when it denied her May 16, 2012 and October 4, 2012 requests to appoint a mold expert. She argues the expert appointment is a reasonably necessary ancillary defense service and the court should have granted the requests. Both rulings were well within the court's discretion and did not deny mother due process.

We review the dependency court's orders for abuse of discretion. (*Coronevsky v. Superior Court* (1984) 36 Cal.3d 307, 321.) "In analyzing a due process claim, we apply a 'flexible balancing standard' that considers (1) the private interest that the official action will affect; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the dignity interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible governmental official; and (4) the governmental interest, including the

function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [Citations.]" (*In re Walter E.* (1992) 13 Cal.App.4th 125, 137 [rejecting claim that juvenile court denied appellant due process by refusing to appoint a second psychologist chosen by appellant to examine child].)

A parent has substantial private interests at stake in a dependency proceeding, but the state has an equal if not superior countervailing interest in protecting the safety of the child, his or her best interests, and in providing "an expedited proceeding to resolve the child's status without further delay. [Citations.]" (*In re Walter E.*, *supra*, 13 Cal.App.4th at p. 138) We are satisfied that both times the dependency court denied mother's request to appoint an expert, the court acted within its discretion, balancing the mother's interest against the interests of the minor and the need to keep the dependency proceeding moving forward. (*Ibid.*)

The dependency court denied mother's May 16, 2012 request for county funding for an expert witness on the same day it granted counsel's motion to be relieved and agreed to permit mother to represent herself. Mother made no factual showing the expert was reasonably necessary to her defense and instead simply stated in conclusory form, "Since I'm representing myself in [propria persona], I wonder whether this court can cover the expense for expert witness fees." Mother did not explain why an expert was necessary, and therefore did not establish how denial of her request would result in a denial of due process. We presume that where the record is silent, the facts would support lower court's order, and appellant must affirmatively demonstrate any error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Mother has failed to show how the court abused its discretion by denying her May 16, 2012 request for county funding for an expert witness.

Mother's counsel did not make her second request for appointment of an expert witness until the third day of a five-day jurisdiction hearing. Mother filed a "Motion for Dr. Katz's 730 evaluation for the child's mold allergy, asthmas" on October 4, 2012. The motion does not describe how Dr. Katz's appointment would assist the dependency court in determining whether jurisdiction under section 300 was proper, but presumably mother

14

hoped to show that E.M. suffered from mold allergies, and therefore, her insistence on further testing was not irrational. E.M.'s counsel objected to the appointment stating, "The crux of this case is excessive medical testing of my client." E.M.'s counsel argued it would be ridiculous for the court to order additional testing in the midst of adjudicating the veracity of the Department's petition. The Department objected to the motion as untimely because it had just been served on counsel and because evidence already before the court showed E.M. had been screened for mold allergies and was found to have none. The court denied the request "for the reason stated by counsel, including not timely and excessive."

Mother argues the denial for untimeliness constitutes an abuse of discretion, because her original May 16, 2012 request was well in advance of trial. We disagree-- mother could have renewed her request for appointment of the expert in advance of trial but failed to do so. The untimeliness of the mid-hearing motion is a sufficient basis alone to find no abuse of discretion in the ruling of the dependency court. Moreover, by the time the motion was made, the court already had before it significant evidence about mold, its effects, and Dr. Katz's report finding mother was allergic to mold. The court could reasonably conclude the limited value of any testimony from Dr. Katz did not justify any further testing of E.M. or the continued delay of proceedings that had already taken eight months.

## DISPOSITION

The orders are affirmed.


KRIEGLER, J.


We concur:


TURNER, P. J.


MOSK, J.